UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ONLINE PUBLICATION ONLY

JEROME WINKLER,

                                        Plaintiff,

        - versus -

HERSHEY FRIEDMAN; AGRI-STAR MEAT
& POULTRY LLC; SHF INDUSTRIES,

                                        Defendants.

MEMORANDUM
AND ORDER
12-CV-3893

APPEARANCES :

        JEROME WINKLER
                3711 Lyme Avenue
                Brooklyn, NY  11224
                Plaintiff, *Pro Se*

        GARSON SEGAL STEINMETZ FLADGATE LLP
                164 West 25th Street, Suite 11R
                New York, NY  10271
        By:     Michael Myer Steinmetz
                *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

        Jerome Winkler brings this *pro se* diversity action against Hershey Friedman,

Agri-Star Meat & Poultry LLC ("Agri-Star"), and SHF Industries ("SHF") alleging breach of

contract.  Agri-Star and SHF move to dismiss Winkler's complaint pursuant to Federal Rule of

Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) for failure to state a claim.  I heard oral argument on

March 7, 2013.  For the reasons stated below, Agri-Star and SHF's motion to dismiss is granted.

BACKGROUND

A.   *Factual Allegations*

Winkler alleges the following facts, which I must accept as true for purposes of deciding this motion.[1]  *See Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).

In October 2010 Winkler entered into an agreement with (1) Daniel Hirsch, who was acting in his capacity as President of Agri-Star; (2) Friedman, who was acting in his capacity as CEO of Agri-Star; and (3) Agri-Star.  Am. Compl. ¶ 8, ECF No. 5.[2]  The agreement was as follows:

> (1) Agri-Star would hire Winkler to serve as a consultant for a period of six months and pay all travel related expenses, *id*. ¶ 8(a);
>
> (2) Agri-Star would pay Winkler "a sliding scale of between 1 ½% - 3% of gross sales" to new customers for a period of three years, *id*. ¶ 8(b);
>
> (3) Winkler would "procure approvals and customers for the products produced in Postville, Iowa at the Agri-Star plant," *id*. ¶ 8(c);
>
> (4) Winkler would institute "programs . . . to utilize all the permissible animal products that were being treated as waste, and after USDA [United States Department of Agriculture] FSIS [Food Safety and Inspection Service] approval use those products for either edible or pharmaceutical purposes . . . for a 25% net revenue realization," *id*. ¶ 8(d);

---

[1]     These factual allegations are set forth in Winkler's complaint in addition to Winkler's opposition papers and accompanying exhibits.  Generally, a court may not look outside the pleadings when reviewing a Fed. R. Civ. P. 12(b)(6) motion to dismiss.  However, the mandate to read the pleadings of *pro se* litigants liberally makes it appropriate to treat new factual allegations in Winkler's opposition papers (and the attachments thereto) as further amending his amended complaint.  *See, e.g.*, *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987) (considering *pro se* plaintiff's affidavit submitted in opposition to defendants' motion to dismiss in reviewing district court's dismissal of claims); *Sommersett v. City of New York*, 09-CV-5916, 2011 WL 2565301, at *3 (S.D.N.Y. June 28, 2011) ("[W]here a pro se plaintiff has submitted other papers to the Court, such as legal memoranda, the Court may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations.") (internal quotation marks omitted).

[2]     Winkler alleges in his opposition papers that this agreement was effectuated on or about September 13, 2010.  Winkler Resp. 1, ECF No. 29.  To avoid confusion, I will refer to the agreement as the "October 2010 agreement" throughout this opinion.

(5) Agri-Star would take "all necessary steps required to obtain the various international approvals needed for export . . . with all costs borne by Agri-Star," *id.* ¶ 9;

(6) Hirsch and Friedman would give Winkler a "mandate" to "institute all and any necessary changes and efficiencies to help make the company maximize its potential," *id.* ¶ 10.

1.      *Winkler's Visit to the Agri-Star Plant*

On November 5, 2010 Winkler sent Hirsch an email notifying him that he would be heading to Postville, Iowa to inspect the Agri-Star plant in a few days.  Winkler Resp. Ex. D, ECF No. 29.  He informed Hirsch of his plan to "spend time on kill floor setting up the program, and hands on step by step procedures" with the goal of "a minimum of 50% increase with possibility for 75-100% increase in yield."  *Id.*  Hirsch responded shortly thereafter with the contact information of Agri-Star liaisons, who would assist Winkler during his inspection of the Agri-Star plant.  *Id.*

A week later, on November 12, 2010, Hirsch sent Winkler an email asking if he could return to Postville "to meet our beef Guru."  *Id.* Ex. C.  He also proposed the following terms and compensation:

1.   2500 a week to get procedures in place for 6 months.  This means help for setting up efficient removal of tongues, tripes, casings, etc. . . .

2.   setting up sales for Israel for 1.5 percent

3.   sales of treif at 1.5[3]

4.   sales of by products at 3 percent

5. Setting up agri for pharmaceutical usage. . . .  25 percent of gross profit after all costs are taken into account by a separate financial individual might be feasible.

---

[3]      At oral argument, counsel for Agri-Star and SHF clarified that "treif" refers to non-Kosher products.

3

*Id*.  He concluded with the request, "if this [is] similar to what you envisioned please let me know."  *Id*.

Winkler's inspection of the Agri-Star plant and processes revealed that "a large quantity of usable, edible and inedible material is going to waste."  Am. Compl. ¶ 15.  Winkler subsequently instituted programs with the USDA Veterinary Supervisor in Charge, which included "the saving for edible purposes Beef Feet, Beef Kidneys, Beef Tripe, Beef Tongue, Beef Head Meat."  *Id*.  Hirsch later conspired with other members of Agri-Star's senior management to block the institution of such programs.  *Id*. ¶ 16.  Winkler persevered in instituting these programs, which operate at present.  *Id*.  Agri-Star has refused to compensate Winkler for instituting such programs.  *Id*.

2.    *Winkler's Work on Behalf of Agri-Star from November 2010-January 2011*

On November 18, 2010 Hirsch sent an email to Winkler (copying Friedman and another Agri-Star employee) authorizing Winkler to travel to Washington, D.C. and Iowa "to take care of export issues and halal certification and costs associated with this project."  Winkler Resp. Ex. E.  On November 23, 2010 Winkler met with Dr. Ron Dutrow, Chief of the USDA Export Verification ("EV") program, and agreed "for Agri-Star to be accepted into the EV database, once the necessary forms were submitted."  *Id*. 2.  Hirsch assigned Danny Boothe, Agri-Star's operations manager, the task of submitting the forms.  *Id*.  Boothe failed to submit the forms.  *Id*.

In December 2010 Winkler communicated with Tobitha Jones and Mark Myers from the USDA about Agri-Star's participation in the "Gulf Food Show" in Dubai, "a free USDA sponsored event."  *Id*.  In order to facilitate Agri-Star's participation, Winkler arranged

4

for Dr. Habib Ghanim, a member of "a recognized Halal certifying body," to inspect and provide certification for the Agri-Star plant.  *Id.*  On December 6, 2010 Winkler and Dr. Ghanim traveled to Postville and Dr. Ghanim inspected the Agri-Star plant.  *Id.*  Winkler and Dr. Ghanim agreed that certification would be provided to the plant "once the necessary forms and documents were filled out."  *Id.*  That paperwork "was not filed until months later, after registration (which is free) for the Dubai show was closed."  *Id.*

On December 22, 2010 Hirsch gave Winkler the "sales journals" for Agri-Star's sales from November to December.  *Id.*  Winkler determined that "there was no oversight to the sales dept.," an opinion he shared with Boothe "in strict confidence."  *Id.*  Boothe then proceeded to share Winkler's opinion with the entire sales department and management staff, "poison[ing] Winkler's] relationship with mid-level managers and "caus[ing] a complete lack of co-operation or even setting roadblocks to getting things done."  *Id.*

On December 26, 2010 Winkler traveled to Israel with Hirsch and Friedman to meet with potential customers for Agri-Star products.  *Id.*  Winkler introduced Hirsch and Friedman to the owners and senior management for Neto, Inc. and Lachowtiz Inc., meat importing companies.  *Id.*  Winkler has had business relationships with both companies for over thirty years.  *Id.*  On January 2, 2011 Winkler, Hirsch, and Friedman toured the facilities of both companies.  *Id.*  Hirsch subsequently executed a memorandum of understanding.  *Id.*

In January 2011 Winkler arranged for sales of Agri-Star's products to Market Distributors, located in the Bronx, New York.  *Id.* 2, Ex. G, H, I; Am. Compl. ¶ 11.  Market Distributors offered to purchase Agri-Star's products "at higher prices than Agri-Star was getting, or fair market pricing."  Winkler Resp. 2.  Agri-Star established an account for Market Distributors on January 27, 2011.  *Id.* Ex. H.  It then "commenced selling to that account and

continues to sell [to] that account, but has refused to provide a proper accounting and to pay [Winkler] the agreed upon commissions."  Am. Compl. ¶ 11.

> 3.      *Winkler's Work on Behalf of Agri-Star from March-July 2011*

In March 2011 Winkler met with Tim Quackenbush, a purchasing agent for the New York State Department of Corrections, to discuss sales of Agri-Star's products for use in "the commissaries of various correctional institutions."  Winkler Resp. 3.  Agri-Star refused to provide Winkler with the necessary documents to make Agri-Star an approved vendor.  *Id*. Winkler later discovered that Agri-Star had directly "solicited the business" of the Department of Corrections, preventing Winkler from earning commissions under the October 2010 agreement. *Id*.

In March 2011 Winkler also met with Ed Lipkowski, Chief Purchasing Agent for the New York City Department of Corrections, to discuss sales of Agri-Star's products.  *Id*. Agri-Star again refused to provide Winkler with the necessary documents to make Agri-Star an approved vendor.  *Id*.  Winkler later discovered that Agri-Star had directly "solicited the business" of the City of New York, preventing Winkler from earning commissions under the October 2010 agreement.  *Id*.

In April 2011 Winkler arranged for an inspection of the Agri-Star plant by Dr. E. Nili, former Chief of Veterinary Services for the Government of Israel, "to advise and recommend bringing [the] facility into compliance with international [s]tandards."  *Id*.  Dr. Nili inspected the plant on May 11-13, 2011.  *Id*.  Agri-Star's managers failed to comply with "any recommendations made by [Winkler] prior to this inspection" and with "the majority of the recommendations made by Dr. Nili after that inspection."  *Id*.  Agri-Star requested a follow-up visit by Dr. Nili and Winkler arranged for him to return on June 27-30, 2011.  *Id*.  Agri-Star also

requested that "the rabbinical authority . . . make an inspection of [the] facility to gauge compliance with [the] Rabbinical requirements of the Gov[ernmen]t of Israel." *Id*. Winkler accordingly arranged for Rabbi Faroul-Hararai, Chief Inspector of the Israeli Rabbinate, to inspect the Agri-Star plant on May 25-26, 2011. *Id*.

On June 15, 2011 Agri-Star paid Winkler $5,000 "to be applied against . . . earned commission[s]" under the October 2010 agreement. *Id*. at 4.

On July 7, 2011 Winkler arranged a meeting with Duane Williams, Chief of the Commodity Purchasing program of the USDA Agricultural Marketing Service. *Id*.; Am. Compl. ¶ 12. Hirsch also attended the meeting. Winkler Resp. 4. At the meeting, Williams expressed enthusiasm about the prospect of Agri-Star participating as a new vendor in the program. *Id*. Hirsch refused to provide Winkler with "the necessary details . . . to sign up to be an approved vendor." *Id*. This refusal deprived Winkler of earning commissions under the October 2010 agreement. *Id*.; Am. Compl. ¶¶ 13-14.

In July 2011 Winkler arranged for sales of Agri-Star's product to Stockyard Meat Packing in Renton, Washington. Winkler Resp. 4. As part of this arrangement, Stockyard Meat Packing arranged for Winkler to display Agri-Star products at a trade show sponsored by Unified Grocers. *Id*. Agri-Star "proceeded to do business with and make sales" to Stockyard Meat Packing without paying Winkler commissions under the October 2010 agreement. *Id*.

B.    *Procedural History*

Winkler filed the original complaint, naming as defendants Hirsch, Friedman, Agri-Star, and SHF, on August 6, 2012. *See* Compl., ECF No. 1. On August 30, 2012 I issued an order directing Winkler to file an amended complaint within 30 days. *Winkler v. Hirsch*, No. 12-cv-3893, 2012 WL 3779295 (E.D.N.Y. Aug. 30, 2012). That order found that Winkler's

7

original complaint failed to allege each party's citizenship, rendering the Court unable to discern whether the action satisfied the requirements for diversity jurisdiction.[4]  *Id.*

Winkler filed the amended complaint, naming as defendants Friedman, Agri-Star, and SHF, on September 20, 2012.  *See* Am. Compl., ECF No. 5.  On November 30, 2012 Agri-Star and SHF filed an answer to the amended complaint.  *See* Answer, ECF No. 13.  On December 27, 2012 Agri-Star and SHF requested a pre-motion conference to file a motion to dismiss pursuant to Fed. R. Civ. P. 12, or in the alternative, to file a motion to amend the answer pursuant to Fed. R. Civ. P. 15.  *See* Agri-Star & SHF Letter, ECF No. 18.  On January 8, 2013 I denied the request for a pre-motion conference and granted Agri-Star and SHF leave to file a motion to dismiss the amended complaint.

On February 1, 2013 Agri-Star and SHF filed the present motion to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  Agri-Star & SHF Mot. Dismiss Am. Compl., ECF No. 28; *see also* Agri-Star & SHF Mem. in Support, ECF No. 28-2.  On February 14, 2013 Winkler filed papers in opposition to the motion and a cross-motion.[5]  Winkler Resp., ECF No. 29.  I heard oral argument on the motion on March 7, 2013.

---

[4]     At oral argument on the present motion, Winkler produced a 1099 Form, which indicated a Brooklyn address for Agri-Star.  In light of this information, I ordered the parties to show cause why the case should not be dismissed for lack of subject matter jurisdiction.  On March 15, 2013 Agri-Star filed a letter with the Court indicating that it "is an Iowa LLC with its princip[al] place of business in Postville, IA."  Agri-Star Letter 2, Mar. 15, 2013, ECF No. 40.  The letter further indicated that "[a] recent New York accounting office has been set up to process payments only" and that "the form 1099 issued by Agri-Star should not destroy jurisdiction in this matter." *Id.*  On the basis of this representation (which Winkler does not rebut, *see* Winkler Letter, Mar. 21, 2013, ECF No. 39), I find that the Court does retain subject matter jurisdiction over this matter.

[5]     Winkler's cross-motion requests that the court "not entertain any motion brought by Defendants as Defendants by their own admission have not answered timely in direct opposition to Rule 12 of FRCP" and "declare the defendants Agri-Star and SHF in default."  Winkler Resp. 10.  Winkler's cross-motion (filed in conjunction with his papers in opposition to the motion to dismiss) is his first such request for the Court to declare the answer untimely and to rule defendants Agri-Star and SHF in default.  In accordance with the Federal Rules of Civil Procedure, obtaining a default judgment is ordinarily a two-step process.  First, the party seeking a default must have the Clerk of Court enter default pursuant to Fed. R. Civ. P. 55(a).  Once default has been entered, the party may then move for a default judgment from the Court pursuant to Fed. R. Civ. P. 55(b).  The Clerk did not enter default in this case.  Moreover, as a general matter, the courts consider a default judgment to be an extreme sanction "reserved for rare occasions."  *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 92 (2d Cir. 1993).  Accordingly, "when doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party." *Id.*

DISCUSSION

A.      *The Standard of Review*

In considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, a court must accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  However, a court need not accept as true "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  If a party does not "nudge[] [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

District courts are required to read *pro se* complaints liberally; "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  The court must therefore interpret the complaint "to raise the strongest arguments that it suggests."  *Chavis v. Chappuis*, 618 F.3d 162, 170 (2d Cir. 2010) (quoting *Harris v. City of N.Y.*, 607 F.3d 18, 24 (2d Cir. 2010)) (internal quotation marks omitted).  Nevertheless, a *pro se* plaintiff must still comply with the relevant rules of procedural and substantive law, *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983), including pleading "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570;

---

at 96.  Here, the untimely filing does not appear egregious, Winkler was not substantially prejudiced, and motion practice is proceeding.  Accordingly, I deny Winkler's cross-motion and proceed to consider Agri-Star and SHF's motion to dismiss on the merits.

*see also LoSacco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir. 1995) ("Although *pro se* litigants should be afforded latitude, they generally are required to inform themselves regarding procedural rules and to comply with them.").

B.      *Analysis*

Liberally construing the amended complaint, Winkler's factual allegations raise a breach of contract claim.  Winkler alleges three types of breach.  First, Winkler alleges that Agri-Star and SHF failed to compensate him for instituting programs to utilize animal products treated as waste.  Second, Winkler alleges that Agri-Star and SHF failed to pay him sales commissions for new customers he procured.  Third, Winkler alleges that Agri-Star and SHF prevented him from earning agreed upon sales commissions by undermining his attempts to procure customers.

Agri-Star and SHF move to dismiss all claims against SHF on the ground that Winkler has failed to allege any facts supporting a claim against SHF.  Agri-Star and SHF also move to dismiss the claims against them on the ground  that they are barred by the New York Statute of Frauds.

1.  *Claims Against SHF*

Neither party has clarified the precise relationship between Agri-Star and SHF, but SHF appears to be the parent corporation of Agri-Star.  According to Winkler's opposition papers, SHF purchased the assets of a meat slaughtering and processing company called "Agriprocessors" in Postville, Iowa in July 2009.  Winkler Resp. 1.  SHF subsequently used those assets to form Agri-Star.  *Id.*

As a general proposition, New York law treats parent and subsidiary corporations as separate legal entities.  *See Carte Blanche (Singapore), Pte, Ltd. v. Diners Club International*, 2 F.3d 24, 26 (2d Cir. 1993); *see also William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d

Cir. 1989) ("It is well settled that New York courts are reluctant to disregard the corporate

entity.") (citing cases).  In New York, a party seeking to pierce the corporate veil must make a

two-part showing: "(i) that the owner exercised complete domination over the corporation with

respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or

wrong that injured the party seeking to pierce the veil." *American Fuel Corp. v. Utah Energy*

*Development Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997) (citing *Morris v. New York State*

*Department of Taxation & Finance*, 82 N.Y.2d 135 (N.Y. 1993) (citing cases)).  The first prong,

"complete domination of the corporation," is "the key to piercing the corporate veil," but "such

domination, standing alone, is not enough; some showing of a wrongful or unjust act toward [the

party seeking piercing] is required."  *Id.* (citing *Morris*, 82 N.Y.2d at 141-42).

   Even under a liberal construction of the complaint, Winkler fails to plausibly

allege that SHF exercised any domination, let alone complete domination, over Agri-Star.  The

determination of "whether a parent corporation's control and domination requires the court to

disregard the corporate form calls for examination of a number of factors involving the

interactions between parent and subsidiary." *Carte Blanche*, 2 F.3d at 26.  Here, the Court lacks

information as to any factor that would illuminate such interactions.  Accordingly, Winkler's

claims against SHF must be dismissed.

   2. *New York General Obligations Law § 5-701(a)(1)*

   New York General Obligations Law § 5-701 is the statutory embodiment of the

Statute of Frauds.  Section 5-701(a)(1) of the law provides:

> Every agreement, promise or undertaking is void, unless it or some
> note or memorandum thereof be in writing, and subscribed by the
> party to be charged therewith . . . if such agreement, promise or
> undertaking: . . . [b]y its terms is not to be performed within one
> year from the making thereof . . . .

The purpose of the law is "to prevent fraud in the proving of certain legal transactions particularly susceptible to deception, mistake and perjury." *Foster v. Kovner*, 840 N.Y.S. 2d 328, 331 (N.Y. 2007) (quoting *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y. 2d 449, 453 (1984)); *Sheehy v. Clifford Chance Rogers & Wells LLP*, 3 N.Y. 3d 554, 560 (N.Y. 2004) ("Because memories fail over time, the statute requires a written contract for an agreement that is not to be performed within one year of its making.").

The required "note or memorandum" need not be a single document.  It may take the form of several notes or memoranda, so long as the multiple writings are "connected with one another expressly or by the internal evidence of subject-matter and occasion" and at least one of them is signed by the party to be charged.  *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 53 (N.Y. 1953).  But the writing or writings must set forth all the material terms of the agreement, "either expressly or by reasonable implication."  *Hawley Fuel Coalmart, Inc. v. Steag Handel GmbH*, 796 F.2d 29, 33 (2d Cir. 1986) (internal quotation marks omitted).  A term is material, and must thus appear in the memorandum, "if it seriously affects the rights and obligations of the parties."  *Ginsberg Machine Co. v. J & H Label Processing Corp.*, 341 F.2d 825, 828 (2d Cir. 1965).  The writing or writings must also "provide 'evidence of [the defendant's] assent to paying the fee' purportedly agreed upon."  *AG Ltd. v. Liquid Realty Partners, LLC*, 448 F. Supp. 2d 583, 586 (S.D.N.Y. 2006) (quoting *Karlin v. Avis*, 457 F.2d 57, 61 (2d Cir. 1972)) (alteration in original).

a. *Whether the October 2010 Agreement Was in Writing*

Winkler contends that the Statute of Frauds is inapplicable because the October 2010 agreement "was in writing as evidenced by numerous e-mails and proposals" between

himself and defendants "that contain the essential and material terms of their agreement."

Winkler Resp. 7.  The writings that Winkler proffers as evidence of such an agreement are:

(1)     An unsigned "proposal" that Winkler circulated to Hirsch sometime in August or September 2010, in which Winkler describes his areas of expertise and lays out the terms and compensation for his providing consulting, sales, and marketing services to Agri-Star, *id.* 1, Ex. A;

(2)     September 13, 2010 emails between Winkler and Hirsch, in which Winkler sends Hirsch several links related to meet processing and food safety regulations, and Hirsch responds "which one is necessary to get the ball rolling? the first link has no real way for me to figure out which part of the site?," *id.* 1, Ex. B;

(3)     November 5, 2010 emails between Winkler and Hirsch, in which Winkler informs Hirsch he will be flying out to visit the Agri-Star plant in a few days, and Hirsch responds that he informed Gary Norris, operations manager of the facility, that "you are the boss and do everything you ask," *id.* 1, Ex. D;

(4)     November 12, 2010 email from Hirsch to Winkler, in which Hirsch proposes the following terms and compensation – (1) "[$]2500 a week to get procedures in place for 6 months . . . for efficient removal of tongues, tripes, casings, etc.;" (2) "setting up sales for Israel for 1.5 percent;" (3) "[s]ales of treif at 1.5; (4) "[s]ales of by products at 3 percent; and (5) "25 percent of gross profit" for "[s]etting up agri for pharmaceutical use – and asking Winkler "if this [is] similar to what you envisioned," *id.* 1, Ex. C;

(5)     November 18, 2010 email from Hirsch to Winkler, in which Hirsch authorizes Winkler's travel to Washington, DC and Iowa "to take care of export issues and halal certification," *id.* 2, Ex. E;

(6)     Emails from January to July 2011 between Hirsch, Winkler, and various Agri-Star employees, in which Winkler establishes an account for Market Distributors and Agri-Star confirms shipment of products to the new account, *id.*, Exs. G, H, I;

(7)     July 13, 2011 emails between Winkler and Hirsch, in which Hirsch refers to Winkler's commissions for Israel and Market Distributors to be "as we discussed" and for USDA to be "as we discussed" and "as agreed upon," *id*. 4, Ex. K;

(8)     August 3, 2011 emails between Winkler and Hirsch, in which Hirsch informs Winkler "u dont represent agri anymore to anybody exc[e]pt thos[e] custome[r]s previously agreed on," *id*. Ex. M;

(9)     August 16, 2011 emails between Winkler and Hirsch, in which Hirsch informs Winkler "I don[']t want your services anymore," *id*. Ex. N;

(10)    Emails from August to December 2011 between Winkler and Hirsch, in which Winkler requests an account of his commissions and alludes to "compensation issues," *id*. Ex. M;

(11)    January 25, 2012 email from an Agri-Star employee to Winkler discussing "tasks" Winkler has been assigned, including "prices from South America," *id*. Ex. O.

These writings fail to demonstrate that Agri-Star agreed to the material terms that Winkler alleges were in the October 2010 agreement.  Of the panoply of emails presented by Winkler, only the November 18, 2010 email from Hirsch refers with any specificity to the material terms of an agreement.  But several of those terms deviate from those set forth in the unsigned "proposal," making it impossible to discern the final terms of any alleged agreement. For example, whereas Hirsch proposed that Winkler receive a 1.5 percent commission for sales to Israel, *id*., Ex C, Winkler's unsigned "proposal" suggested that he receive "1.5 % of gross sales or $0.10 per lb whichever is more" of "[a]ll [p]rimal cuts Kosher EXPORT market," *id*., Ex. A.  These terms relate both to the scope of Winkler's services (*i.e.* sales to Israel versus other markets) as well as compensation (*i.e.* 1.5 percent versus $ 0.10 per pound) and, therefore, substantially affect the rights and obligations of the parties.

14

Even if the terms in the November 18, 2010 email were consistent with those in the unsigned "proposal," the writings proffered by Winkler fail to satisfy the Statute of Frauds because neither Agri-Star nor SHR ever assent to those terms.  The November 18, 2010 email is written in the form of a proposal that concludes by asking Winkler whether the terms articulated are "similar to what [he] envisioned."  *Id*. Ex. C.  Winkler provides no response to this proposal. None of the other emails refer to an agreement on the terms in either the November 18, 2010 email or in the unsigned "proposal."  In fact, several of the emails upon which Winkler relies as evidence of an agreement indicate the precise opposite.  For example, the July 13, 2011 emails between Winkler and Hirsch suggest a difference of opinion as to sales commissions.  Winkler Resp. Ex. K ("before u follow up i want to be very clear on com[m]issions!!!;" "i dont want any misunderstandings").

> b.   *Whether the October 2010 Agreement was Capable of Performance Within a Year*

Winkler further contends that even if the October 2010 agreement constitutes an oral agreement, it could be performed within one year, rendering the Statute of Frauds inapplicable.  As the New York courts have "long ago stated, and frequently repeated," the law

> only applies to agreements which are, by express stipulation, not to be performed within a year.  It does not apply to an agreement which appears by its terms to be capable of performance within the year; nor to cases in which the performance of the agreement depends upon a contingency which may or may not happen within the year.

*North Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, 22 N.Y. 2d 171, 191 (N.Y. 1968) (quoting *Dresser v. Dresser*, 35 Barb. 573, 577 (N.Y. Gen. Term 1862)).  Thus, "if the obligation of the contract is not, by its very terms or necessary construction, to endure for a longer period than a

year, it is a valid agreement, although it may be capable of an infinite continuance." *Trustees of the First Baptist Church v. Brooklyn Fire Insurance Co.*, 19 N.Y. 305, 307 (1859).

(1)     *Sales Commissions*

Winkler alleges that the October 2010 agreement contemplated that Agri-Star would pay Winkler sales commissions "between 1 ½% - 3% of gross sales" to new customers for a period of three years. Am. Compl. ¶ 8(b). It is plain that a three-year obligation of compensation cannot be performed in one year. And while Agri-Star and SHF "could have terminated plaintiffs' role as agent within a year," they "could not have terminated [their] obligation to pay commissions." *Levine v. Zadro Products Inc.*, 02-cv-2838, 2003 WL 21344550, at *4 (S.D.N.Y. June 9, 2003). The liability to pay commissions is "not dependent upon any act of the plaintiffs or the defendants . . . but [i]s wholly dependent upon the act of the third party, the procured customer." *Nat Nal Service Stations, Inc. v. Wolf*, 304 N.Y. 332, 339 (N.Y. 1952). Accordingly, "New York courts have consistently found the Statute of Frauds to apply where such commission agreements are involved." *Levine*, 2003 WL 2134450, at *5 (citing *Zupan v. Blumberg*, 2 N.Y.2d 547, 550 (N.Y. 1957)); *Martocci v. Greater New York Brewery, Inc.*, 301 N.Y. 57 (N.Y. 1950)). Because the alleged oral agreement as to commission payments cannot be performed within one year, the Statute of Frauds applies and that agreement is unenforceable.

(2)     *Programs to Utilize Animal Products Treated as Waste and Facilitating Sales Commissions*

Winkler alleges that the October 2010 agreement contemplated that Agri-Star would compensate him for instituting programs to utilize animal products treated as waste. Am Compl. ¶ 8(d) ("Plaintiff . . . agreed that programs would be set in place to utilize all the permissible animal products that were being treated as waste . . . [and] to institute those

16

programs for a 25% net revenue realization of those waste products."). Winkler further alleges that the agreement contemplated that Agri-Star and SHF would facilitate his procurement of customers, thereby facilitating his earning of commissions. *Id*. ¶ 8(b) ("Agri-Star desires to enter into the export market . . . . Plaintiff . . . agreed to procure approvals and customers for the products produced in Postville, Iowa at the Agri-Star plant."). Neither of these alleged portions of the agreement establishes a fixed period of time in which the parties are to carry out their obligations.

It is "settled law in New York that, absent an agreement establishing a fixed duration, an employment relationship is presumed to be hiring at will, terminable at any time by either party." *Sabetay v. Sterling Drug, Inc.*, 69 N.Y. 2d 329, 333 (N.Y. 1987); *Rooney v. Tyson*, 91 N.Y.2d 685, 689 (N.Y. 1998). This "at-will presumption may be triggered when an employment agreement fails to state a 'definite period of employment,' 'fix employment of a definite duration,' 'establish a fixed duration' or is otherwise 'indefinite.'" *Rooney*, 91 N.Y. 2d at 689 (citations and alterations omitted). An "at-will employment relationship may be 'freely terminated by either party at any time for any reason or even for no reason' with limited exceptions." *Cron v. Hargro Fabrics, Inc.*, 91 N.Y.2d 362, 367 (N.Y. 1998) (quoting *Murphy v. American Home Products Corp.*, 58 N.Y. 2d 293, 300 (N.Y. 1983). Accordingly, "an at-will relationship may usually be completed within a year and ordinarily would not require performance to extend beyond that time." *Id*. at 367. Thus, the Statute of Frauds is inapplicable as to the alleged oral agreements to compensate Winkler for instituting programs to utilize animal products treated as waste and to facilitate his procurement of customers.

3.    *New York General Obligations Law § 5-701(a)(10)*

Section 5-701(a)(10) of the New York General Obligations Law provides:

17

> Every agreement, promise or undertaking is void, unless it or some
> note or memorandum thereof be in writing, and subscribed by the
> party to be charged therewith . . . if such agreement, promise or
> undertaking: . . . [i]s a contract to pay compensation for services
> rendered . . . in negotiating the purchase, sale, exchange, renting or
> leasing . . . of a business opportunity, business, its good will,
> inventory, fixtures or an interest therein.

This provision of the law "applies to various kinds of intermediaries who perform limited

services in the consummation of certain kinds of commercial transactions."  *Freedman v.*

*Chemical Construction Corp.*, 43 N.Y.2d 260, 266 (N.Y. 1977).  While the New York courts

have hesitated to resolve the ultimate scope of the provision, they instruct that it applies where

"the intermediary's activity is . . . evidently that of providing 'know-how' or 'know-who,' in

bringing about between principals an enterprise of some complexity or an acquisition of a

significant interest in an enterprise."  *Id*. at 267.

The alleged oral agreement to compensate Winkler for instituting programs to

utilize animal products treated as waste fits squarely within this definition of "business

opportunity."  Winkler himself describes his "know-how" and "know-who" with respect to this

line of work.  He alleges that, on the basis of "his extensive experience and unique methods in

maximizing the utilization of animal product, byproducts, and feed-stocks, along with

specialized expertise in export regulation and documentation, logistics, market trends, and

quality control," he agreed to establish programs "to utilize all the permissible animal products

that were being treated as waste."  Am. Compl. ¶ 9(d).  The "complexity" of this undertaking is

illustrated by an email from Hirsch to Winkler on November 18, 2010, in which Hirsch notes

that he has been "hearing from many people in Iowa not to believe you, many tongues

condemned etc." but that he would "fight to make sure this works."  Winkler Resp. Ex. C.

Accordingly, the alleged oral agreement to compensate Winkler for instituting such programs is subject to the Statute of Frauds and is unenforceable.

The same conclusion is warranted for the alleged oral agreement to facilitate Winkler's procurement of customers, thereby facilitating his earning of commissions. Winkler's allegation, in essence, is that Agri-Star and SHF sabotaged his ability to earn the commissions due him for successfully recruiting customers. Pursuant to § 5-701(a)(10) of the New York General Obligations Law, "negotiating" includes "procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction." Winkler alleges that he "through his extensive contacts and previous experience agreed to procure approvals and customers for the products produced in Postville, Iowa at the AGRI-STAR plant." Am. Compl. ¶ 9(c). This line of work, therefore, indisputably falls within the definition of "business opportunity" contemplated by the Statute of Frauds. *See also Intertex Trading Corp. v. Ixtaccihuatl S.A. de CV*, 754 F. Supp. 2d 610, 615 (S.D.N.Y. 2010) ("[Plaintiff]'s claims are barred by section 5-701(a)(1) of the statute of frauds because they rest on an alleged oral agreement whereby [plaintiff] supposedly 'procur[ed] an introduction' for the Defendants."); *Bronner v. Park Place Entertainment Corp.*, 137 F. Supp. 2d 306, 311 (S.D.N.Y. 2001) (holding that an oral commission agreement for procuring introduction to a party and assisting in negotiation and consummation of business opportunity between defendant and that party was unenforceable under the Statute of Frauds). Accordingly, the alleged oral agreement to facilitate Winkler's procurement of customers is subject to the Statute of Frauds and is unenforceable.

4.    *Promissory Estoppel*

Winkler argues that Agri-Star is precluded from relying on the Statute of Frauds under the doctrine of promissory estoppel. Under New York law, promissory estoppel consists

of three elements: "'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and injury sustained by the party asserting the estoppel by reason of his reliance.'" *Cyberchron Corp. v. Calldata Systems Development, Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (citing cases). Both "law and equity exert gravitational pulls on the doctrine, and its application in any particular case depends on the context in which it appears." *Merex A.G. v. Fairchild Weston Systems, Inc.*, 29 F.3d 821, 825 (2d Cir. 1994). But when a party seeks to use promissory estoppel to circumvent the Statute of Frauds, "the claim is more equitable than promissory in nature." *Id.*

Here, Winkler fails to plausibly allege the existence of "a clear and unambiguous promise." As discussed above, Winkler proffers an amalgam of writings in support of the claim that he and Agri-Star entered into a written agreement. Of those writings, only two refer with any particularity to the terms of the alleged agreement. The first is an unsigned "proposal" drafted by Winkler himself. Winkler Resp. Ex. A. The second is a November 18, 2010 email from Hirsch to Winkler, which is a proposal as to terms (which differ from those in the unsigned "proposal") rather than "a clear and unambiguous promise." *Id.* Ex. C. Accordingly, Winkler's reliance on promissory estoppel to revive the claims barred by the Statute of Frauds must fail.

5. *Equitable Estoppel*

Winkler also argues that Agri-Star is precluded from relying on the Statute of Frauds under the doctrine of equitable estoppel. The doctrine is "grounded on notions of fair dealing and good conscience and is designed to aid the law in the administration of justice where injustice would otherwise result." *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996) (citations omitted). Under New York law, equitable estoppel demands a showing of: "(1) [a]n act constituting a concealment of facts or a false misrepresentation; (2) [a]n intention or

20

expectation that such acts will be relied upon; (3) [a]ctual or constructive knowledge of the true facts by the wrongdoers; (4) [r]eliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment." *General Electric Capital Corp. v. Armadora, S.A.*, 37 F.3d 41, 45 (2d Cir. 1994). Equitable estoppel is an "extraordinary remedy," *Nasso v. Bio Reference Laboratories, Inc.*, 11-cv-3480, 2012 WL 4336429, at *6 (E.D.N.Y. Sept. 24, 2012), whose purpose "is to prevent the infliction of unconscionable injury and loss upon one who has relied on the promise of another," *id.* (citing *American Bartenders School, Inc. v. 105 Madison Co.*, 59 N.Y.2d 716, 718 (1983)).

Even construing the facts in the light most favorable to Winkler, he fails to plausibly allege that Agri-Star concealed facts, made misrepresentations, or broke any promises with respect to the alleged October 2010 agreement. In fact, Winkler's factual allegations make clear that the very terms of that agreement were the subject of confusion and dispute. As late as July 13, 2011, Hirsch wrote to Winkler requesting clarification on the issue of commissions and expressing fear as to a potential misunderstanding. Winkler Resp. Ex. K ("before u follow up I want to be very clear on com[m]issions!!!;" "i dont want any misunderstandings"). Accordingly, Winkler's reliance on equitable estoppel to revive the claims barred by the Statute of Frauds must fail.

CONCLUSION

For the foregoing reasons, Agri-Star and SHF's motion to dismiss is granted.


So ordered.


John Gleeson, U.S.D.J.


Dated: June 25, 2013
       Brooklyn, New York